ESTATE OF DAVID B. WORSTER, DECEASED, VINCENT B. WORSTER, EXECUTOR, AND MARGARET R. WORSTER, SURVIVING WIFE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Worster v. Commissioner
Docket No. 29964-81.
United States Tax Court
T.C. Memo 1984-123; 1984 Tax Ct. Memo LEXIS 555; 47 T.C.M. (CCH) 1266; T.C.M. (RIA) 84123; March 12, 1984. *555 Held: Premiums paid on $200,000 group life insurance policy determined to be constructive dividends to stockholder-employee. Sumner E. Nichols, II, for the petitioners. Francis J. Emmons, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Deficiencies in petitioners' income taxes for the years 1977 and 1978 were determined by respondent in the amounts respectively of $13,709 and $12,765. The deficiencies involve the tax treatment of annual premiums paid during the two years by each of two corporations, Worster Motor Lines, Inc. (Worster), and North East Leasing Corporation *556 (Leasing) on policies insuring the life of David B. Worster (Mr. Worster), now deceased. During those two years, Mr. Worster was the principal shareholder and one of the principal executive officers of each of the two corporations. Petitioners have conceded that $3,469 of the premiums paid should be treated as constructive dividends. Thus, the sole remaining issue is the treatment of the annual premium on a $200,000 life insurance policy on Mr. Worster's life in the amount of $21,442 paid by Worster in each year. The statutory notice treats the annual premiums (as well as the other premiums) as a constructive dividend to petitioners. For convenience, the Findings of Fact and Opinion have been combined. Some of the facts have been stipulated and are so found. Mr. David B. Worster and petitioner Margaret R. Worster were husband and wife during the two years involved. Mr. Worster died in 1979 and his son, Vincent B. Worster, duly qualified as executor of his estate. At the time of the filing of the petition, both petitioners were residents of the State of New York. Mr. Worster was the founder and for many years the chief executive officer of Worster, which is an interstate *557 truckline recognized as a common carrier by the Interstate Commerce Commission. The company operated approximately 60 company tractors, 400 company trailers and 130 owner-operated trucks.Mr. Worster also controlled Worster Iowa, Inc., and Worster Michigan, Inc., related companies that together with Worster and Leasing in effect operated as the common carrier. Leasing is the management company which during the years at issue and prior thereto provided management services of various kinds to the trucking companies. The executives, including Mr. Worster and Mr. Vincent Worster, were on the payroll of Leasing and received most of their compensation from that company, with nominal compensation being paid by certain of the operating companies. [1] None of the corporations had ever paid a cash dividend on common stock to shareholders, although at one time Leasing issued preferred stock and apparently paid a cash dividend on the preferred. There was an understanding of some sort that on Mr. Worster's retirement, Mr. Vincent Worster would directly or indirectly acquire his stock interest. *558 In June 1977, Mr. Worster started the retirement process by resigning as president and chief executive officer of Worster in favor of his son, Vincent Worster, and by becoming chairman of the board and chief financial officer. Mr. Vincent Worster moved from executive vice president to president. However, this nominal change in titles and position appears to have had little material affect on management of the companies since Mr. Worster continued to work full time. During and prior to 1977, Mr. Worster also held a half interest in Davis Tire Company, an automotive and truck tire outlet, which company serviced among other customers Worster's vehicles. In 1978, Mr. Worster purchased the outstanding 50 percent of the stock and thereafter was required to devote more time to Davis Tire Company. Prior to that time, he had been devoting approximately the equivalent of one day a month to Davis Tire Company. Prior to 1976, Mr. Worster's salary from Leasing had been $36,000 per year for several years. In 1976 it was increased to $39,000 and in 1977 again increased to $48,000, with the same salary being paid in 1978. During 1977 and 1978, Mr. Vincent Worster received a salary of *559 $40,000 from Leasing. These salaries were included in the management fees charged by Leasing to the common carriers. Mr. Worster also received a salary from Davis Tire Company in the amount of $8,100 in 1976, $17,000 in 1977 and $11,880 in 1978. In 1971 Leasing adopted a plan of noncontributory group term insurance for all employees [2] under which executive employees received $40,000 of life insurance issued by Sun Life Insurance Company of America (Sun Life). This plan apparently continued in effect through the year 1979 and $40,000 of life insurance was paid to Mrs. Worster pursuant thereto. The premium cost of this insurance in 1977 and 1978 apparently was included in the amounts conceded by petitioners. On October 29, 1976, the executive committees of each of Leasing and Worster held meetings at which group life insurance plans were adopted by each company, hereinafter referred to as the 1976 Leasing Plan and the Worster Plan. The two documents are identical except for the corporate names. Each plan purported to be effective as of November 1, 1976, and each plan recited that it *560 "replaces any employee group life plan previously established." Each plan called for a noncontributory "base plan" with three classes of employees, the officers receiving $15,000 in life insurance to be issued by Empire State Mutual Life Insurance Company (Empire), together with a noncontributory "supplemental plan" which established a single class covering all presidents and executive vice presidents with $200,000 of life insurance to be issued by Sun Life. By a document dated September 7, 1977, the Worster plan was amended to change the base plan from Empire to Aetna Life & Casualty Company (Aetna) and increased the amount of insurance for all classes, with the amount for officers being raised to $25,000. The language of the supplemental plan was also changed so that the class was described as "All Chairman [sic] of the Board, Chief Executive Officer, Presidents, Executive Vice Presidents and Chief Operating Officers," each being entitled to $200,000 of life insurance. The 1976 Leasing plan was not implemented at least for the officers, Mr. Worster continuing to be insured under the 1971 plan. Mrs. Worster, as beneficiary, received the proceeds of the $40,000 Sun Life 1971 *561 plan policy. There was only one $200,000 Policy in effect on Mr. Worster's life on the date of his death and that was the policy issued by Sun Life under the Worster plan, as amended. Apparently no insurance proceeds were received from Empire by Mrs. Worster or the estate. [3] Mrs. Worster did receive the proceeds of the Aetna and Sun Life policies issued under the amended Worster plan. Thus, the amended Worster plan was fully implemented, at least as to Mr. Worster, but its effective date is far from clear. The record does not include copies of any of the policies of insurance or any of the circumstances surrounding the purported adoption of the group plans or the amendment to the Worster plan. [4] By supplemental stipulation, the parties submitted an almost illegible copy of an application to Sun Life for $150,000 of life insurance on the life of Mr. Worster, which application appears to be dated November 1, 1976. A $200,000 policy was actually issued in 1977, perhaps in January. The Worster plan amendment mentioned above *562 refers to the plan as adopted August 1, 1977. The parties appear to agree that the date November 4, 1976, is critical since the regulations issued under section 79 [5] were amended in 1979, effective as to insurance provided in employee taxable years beginning on or after January 1, 1977. A late effective date is applicable in some respects to insurance provided under a plan of group term life insurance which was in effect on November 4, 1976, provided on that date the insurer was providing or had entered into a binding contract to provide insurance under such a plan. Respondent recognizes that under some circumstances the consequences to petitioners might be slightly different if we were to hold that the amended Worster plan of group life insurance had been placed into effect and the insurance issued prior to November 4, 1976. Petitioners bear the burden of proof on this as well as other issues in this case and they have failed to convince us that any insurance was issued or any binding contract to issue insurance was entered into prior to the year 1977. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.On this record, *563 the 1979 amendments to the regulations under section 79 would be applicable to the $200,000 Sun Life policy. But for the reasons indicated herein, we do not reach any issue that involves those portions of the section 79 regulations as to which the November 4, 1976, date is critical. Respondent's primary contention is that the $21,442 annual premium paid by Worster on the $200,000 life insurance policy under the amended Worster plan on the life of Mr. Worster represented a constructive dividend *564 taxable to petitioners in each of the years. Respondent argues that the furnishing of that policy was not intended as compensation and if it were, the compensation to Mr. Worster would have been unreasonable to that extent. Petitioners apparently contend that the $200,000 Sun Life policy was a part of a section 79 group term life insurance plan; hence, that portion of the premium referable to the first $50,000 of the group term life insurance was excludable from petitioners' taxable income. Respondent counters that the Sun Life policy could never be part of a group term life insurance plan under the regulations and in addition that certain special limitations applying to a combination of term and permanent benefits in one insurance policy were not complied with. By reason of petitioners' section 79 argument, we infer that petitioners content that the $200,000 policy was part of a compensation package and that Mr. Worster's total compensation was reasonable. However, we cannot even guess at petitioners' position as to compliance with the various regulatory requirements under section 79. With respect to the constructive dividend issue, there is almost nothing in the record as *565 to the circumstances which led to the adoption of the amended Worster plan. [6] There is nothing in the record before us to indicate that there was any discussion at any time as to the need for additional group term life insurance as a means of providing a fringe benefit for the corporate employees, especially the executives or more specifically Mr. Worster. We assume that insurance was issued under the base plan to the rank and file employees as to whom there can be little doubt that it was intended as an additional fringe benefit. Respondent has not questioned the $25,000 base plan policy issued to Mr. Worster. Hence, we will for the purposes of this case assume that the base plan coverage was intended as compensation. But it does not necessarily follow that the supplemental plan was also intended as compensation. We note that while both Worsters were within the class, [7] only Mr. Worster received an insurance policy under the supplemental plan. He received this policy shortly before his retirement process commenced. The provision of additional life insurance under such circumstances may as well be associated with estate planning considerations as with compensation. Petitioners *566 have failed to show that the $200,000 Sun Life policy was intended as compensation. [8]
Moreover, even if petitioner had shown that the Sun Life policy was intended as compensation, the record is similarly bare of any evidence to convince us that Mr. Worster's total compensation, i.e., his cash salary from Leasing and Worster and the $21,442 premium payment, was reasonable. We note that although Mr. Worster purported to have commenced the retirement process, his cash compensation in 1977 and 1978 *567 was actually increased over prior years. In addition, duning 1978 his acquisition of the entire interest in Davis Tire Company required him to devote more time to that company than he had in the prior years and he received compensation from it. The premium on the Sun Life policy would amount to slightly more than a 40 percent increase in the total compensation payable to Mr. Worster for these two years, a circumstance which would warrant a careful explanation at best when reasonableness is made an issue. In addition, placing the premium responsibility for this policy on Worster is inconsistent with the pattern of having Leasing compensate the executives for their services. Payment of compensation to the officers by Leasing with Leasing's management costs being reimbursed by the three operating companies probably simplified the allocation of time spent by each executive on the business of each constituent company. But by directly charging Worster with an additional cash equivalent salary, the value of Mr. Worster's services to Worster is directly raised but cannot be answered on this record. [9]
*568 We have recently held that for premiums on group life insurance to be deductible by the employer, two requirements of the regulations under section 162 must be met. The premium payments must not exceed reasonable compensation for services rendered and payments must be intended as compensation for services. N.W.D. Investment Co. v. Commissioner,T.C. Memo. 1982-564. Petitioners, who bear the burden of proving respondent's determination erroneous, have not carried their burden of proof on either of these issues and, therefore, we find for respondent on each of these issues. We thus do not reach the issues under the section 79 regulations. [10]
Decision *569 will be entered for the respondent.
Footnotes
1. Petitioner Margaret Worster at one time received a salary from Worster which was disallowed in part by respondent. Her compensation is not, however, at issue in this case.↩
2. In 1977 and 1978, Leasing had about six employees, whereas Worster had about 100.↩
3. There is some indication in the record that premium payments were made to Empire, although whether for insurance under a group plan is not known.↩
4. The decedent handled the negotiations for the company. The insurance agent was not called as a witness. Petitioners' counsel refrained from filing either a trial memorandum or an original or a reply brief. Thus, in order to attempt to understand petitioners' theories, we have only the pleadings and the statements of petitioners' counsel during the trial. Neither is illuminating. Moreover, it is incredible that definitive documentation was not obtainable and obtained either from the insurance companies or from the life insurance agent, as well as testimony from the agent. ↩
5. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
6. A letter from the insurance agent, attached to the petition but not introduced in evidence, seems to suggest that the agent initiated discussion of a large policy when Pennsylvania amended its laws removing the ceiling on group term life insurance. That letter, were we to consider it, would not suffice to counter respondent's arguments. ↩
7. There is nothing in the record to indicate that any other employees fell within the class. ↩
8. Our recent discussion in B.B. Rider Corp. v. Commissioner,T.C. Memo. 1982-98, affd. on this issue     F.2d     (3rd Cir., Jan. 24, 1984)↩, contains a useful discussion of this issue under the heading "Issues (3) and (4)."
9. Petitioners' counsel was warned that the record appeared to be insufficient in several respects.↩
10. We also should note that whether the pre-1976 or post-1976 regulations were applicable to the $200,000 Sun Life policy, both require that to come within the scope of sec. 79 the plan of insurance must, among other requirements, preclude "individual selection." In this respect, this case would appear to be governed by our opinion in Towne v. Commissioner,78 T.C. 791↩ (1982), and the Sun Life $200,000 policy would fail to comply with the requirements of sec. 79 and the applicable regulations.